02-11-520-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00520-CV


 
 
 In the Interest of A.T.K., M.A.C., and S.A.C., the
 Children
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

FROM THE 211th
District Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

Appellant
I.S.S. (Mother) appeals the termination of her parental rights to her children
A.T.K. (Adam), M.A.C. (Megan), and S.A.C. (Sarah).[2]  We affirm.

 

 

Background
Facts

At
the time of trial, Mother was twenty-two years old, and she had three children.
 Mother had been in a relationship with R.K. (Royce) until shortly before their
son, Adam, was born in April 2007.  She later met T.C. (Tony), who is the
biological father of Megan, born in June 2009, and Sarah, born in October 2010.

In December
2009, Child Protective Services (CPS) was notified that Tony had assaulted
Mother while Adam and Megan were in the house.  When interviewed by CPS
investigator Robert Gebhardt, Mother stated that she would not see or talk to
Tony again, and she had no intention of allowing him to be around the
children.  From January 2010 until July 2010, Mother attended Friends of Family
services for domestic violence victims.  Although she told counselors there
that she was not in a relationship with Tony any longer, the couple was still
seeing each other and Mother eventually became pregnant with Sarah.  Mother
moved in with Tony and his grandparents during the summer of 2010.

On
December 10, 2010, when Sarah was about two months old, she received
immunizations.  Sarah was upset and crying the rest of the day and overnight. 
Her right leg was swollen, so Mother and Tony took her to the Denton
Presbyterian Hospital the next day where they were provided medicine for a
possible allergic reaction to the shots.  No x-rays were taken.  Mother returned
to the clinic with Sarah on December 13, 2010, where she was told that it was
normal for some children to experience swelling after receiving immunizations,
and while it was not an allergic reaction, to continue the medication for one
week.

When
the swelling did not improve, Mother took Sarah back to the emergency room on
December 23, 2010.  After taking x-rays, it was discovered that Sarah had a
fracture on her right leg.  She was transported to Cook Children’s Hospital for
further examination.  At Cook, x-rays showed that Sarah had five additional
fractures—one on her right clavicle, one on her right tibia, and two on her
left femur.  When interviewed by a Denton police officer, Mother told him that
she believed Sarah’s right femur was fractured as a result of the
immunizations, but she did not have an explanation for the other fractures.

Adam,
Megan, and Sarah were removed from Mother and Tony on December 24, 2010, and Megan
and Sarah were placed in foster care.  Adam was placed with his father, Royce. 
After repeatedly failing drug tests for methamphetamine, Tony voluntarily
relinquished his parental rights to Megan and Sarah.

After
a four-day trial in December 2011, a jury found by clear and convincing
evidence that Mother (1) knowingly placed or knowingly allowed the children to
remain in conditions or surroundings that endangered the physical or emotional
well-being of the children, (2) engaged in conduct or knowingly placed the
children with persons who engaged in conduct that endangered the physical or
emotional well-being of the children, and (3) failed to comply with the
provisions of a court order that specifically established the actions necessary
for the parent to obtain the return of the children, and that termination was
in the best interest of the children.  The trial court appointed the Department
of Family and Protective Services (DFPS) as the permanent managing conservator
of Megan and Sarah, and Royce as the permanent managing conservator of Adam.  Mother
now appeals.

Standard
of Review

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanently—to divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  Tex.
Fam. Code Ann. § 161.206(b) (West 2008); Holick v. Smith, 685 S.W.2d 18,
20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly
construe involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re M.C.T., 250 S.W.3d 161, 167 (Tex. App.—Fort
Worth 2008, no pet.).

Discussion

I.  
Failure to Appoint Counsel and Due Process

In
her fourth issue, Mother argues that the trial court abused its discretion in
failing to appoint counsel for her at the beginning of the case.  To determine
whether a trial court abused its discretion, we must decide whether the trial
court acted without reference to any guiding rules or principles; in other
words, we must decide whether the act was arbitrary or unreasonable.  Low v.
Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire v. Cummings, 134
S.W.3d 835, 838–39 (Tex. 2004).  An appellate court cannot conclude that a
trial court abused its discretion merely because the appellate court would have
ruled differently in the same circumstances.  E.I. du Pont de Nemours &
Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); see also Low, 221
S.W.3d at 620.

Section
107.013 of the family code states in relevant part:

 

          (a) In a
suit filed by a governmental entity in which termination of the parent-child
relationship is requested, the court shall appoint an attorney ad litem to
represent the interests of:

 

                   (1)
an indigent parent of the child who responds in opposition to the termination.

 

                   .
. . . 

          

(c) In a suit filed
by a governmental entity requesting temporary managing conservatorship of a
child, the court shall appoint an attorney ad litem to represent the interests
of an indigent parent of the child who responds in opposition to the suit.

          

(d) A parent who claims indigence under Subsection (a)
must file an affidavit of indigence in accordance with Rule 145(b) of the Texas
Rules of Civil Procedure before the court can conduct a hearing to determine
the parent’s indigence under this section.

Tex.
Fam. Code Ann. § 107.013 (West Supp. 2012).

DFPS
filed its Original Petition for Protection of a Child, for Conservatorship, and
for Termination in Suit Affecting the Parent-Child Relationship on December 27,
2010.  In its order for protection of a child in an emergency and notice of
hearing, signed the same day the petition was filed, the trial court named DFPS
as temporary sole managing conservator of the children, and ordered Mother to
appear at the adversary hearing on January 6, 2011, with “all pertinent
information regarding [Mother’s] income, and that upon a showing of indigency
and opposition to the suit affecting the parent-child relationship that a licensed
attorney at law of this state[] will be appointed.”  Mother appeared for the
adversary hearing on January 6, 2011.  During the hearing, she stated that she
agreed with the order and the service plan.  Additionally, she did not claim
indigence nor file an affidavit of indigence in accordance with Rule 145(b) of
the Texas Rules of Civil Procedure.[3] 
See id. § 107.013(d).  After the adversary hearing, the trial
court signed a temporary order in which it deferred the appointment of an
attorney for Mother.

A
month later, on February 11, 2011, Mother filed an application for court
appointed counsel and financial affidavit.  She also wrote on the application,
“I certify that I am [o]pposed to the termination of my parental rights.” 
Mother’s pro bono counsel filed a Notice of Limited Appearance on
February 25, 2011, and he represented her at the hearing on the Motion for
Appointment of Counsel on March 31, 2011.  The trial court found that Mother
was indigent and that she opposed the suit against her, and it appointed her
counsel.  The trial court then instructed the parties to “go back and get a
date for a termination trial,” and said, “If we’re going to get lawyers, we
might as well move right to a termination trial.”

Mother
argues that this statement by the trial court to “move right to a termination
trial” compressed the amount of time Mother had to complete her services and
prepare for trial, and “in all likelihood had a negative [e]ffect on [Mother’s]
case and the ultimate result.”  However, Mother does not demonstrate how her ability
to complete her services and prepare for trial was compressed or compromised. 
DFPS filed its original petition on December 27, 2010.  The termination trial
began on December 5, 2011, and the order terminating her rights to her children
was signed on December 12, 2011.  The statutory dismissal deadline was January
9, 2012.  See Tex. Fam. Code Ann. § 263.401 (requiring dismissal of the
case “on the first Monday after the first anniversary of the date the court
rendered a temporary order appointing the department as temporary managing
conservator” if trial has not commenced or an extension has not been granted).[4] 
In between the appointment of counsel and the first day of trial, there were
three permanency hearings.  Mother was represented by counsel and participated
in all three hearings.  See In re J.R.P., 55 S.W.3d 147, 150 (Tex.
App.—Corpus Christi 2001, pet. denied) (holding that mother’s constitutional
rights were not violated by the trial court’s failure to appoint counsel
immediately after the filing of the original petition when mother did not
request counsel at the time of the filing of the original petition, received
appointed counsel immediately upon her request, and was represented through the
rest of the proceedings in the trial court).  In summary, there is no evidence
that the case proceeded on a shorter timeline because Mother was appointed
counsel, that Mother was harmed by the delay in appointing counsel for her, or
that the delay in appointing counsel affected the ultimate outcome.  The trial
court thus did not abuse its discretion by failing to appoint counsel at the
adversary hearing on January 6, 2011.  We overrule Mother’s fourth issue.

II.  
Testimony of Trial Judge as a Witness

In
Mother’s fifth issue, she argues that the admission of a court order with
specific negative findings towards her from the trial judge constituted
testimony of the judge as a witness in violation of Texas Rule of Evidence
605.  Under the Texas Rules of Evidence, “the judge presiding at the trial may
not testify in that trial as a witness.”  Tex. R. Evid. 605.  While findings of
fact are not technically testimony, “orders submitted into evidence, containing
findings based on pretrial evidence by the very judge presiding over the termination
proceeding, could be, like a judicial comment on the weight of the evidence, a
form of judicial influence no less proscribed than judicial testimony.”  In
re M.S., 115 S.W.3d 534, 538 (Tex. 2003).  The supreme court “specifically
prohibits judicial comments that indicate the opinion of the trial judge as to
the verity or accuracy of the facts in inquiry.”  Id.  In cases where
the error complained of involves an evidentiary ruling, we examine the whole
record to determine if the complaining party was harmed by the erroneous
admission or exclusion.  Id.

Mother
challenges Petitioner’s Exhibit 15.  Included in the 153–page exhibit was an
unredacted copy of the trial court’s temporary orders from January 6, 2011. 
The orders included these findings:

3.1   Having examined
and reviewed the evidence, including the sworn affidavit accompanying the
petition and based upon the facts contained therein, the Court finds there is
sufficient evidence to satisfy a person of ordinary prudence and caution that:
(1) there was a danger to the physical health or safety of the children which
was caused by an act or failure to act of the person entitled to possession and
for the children to remain in the home is contrary to the welfare of the
children; (2) the urgent need for protection required the immediate removal of
the children and reasonable efforts consistent with the circumstances and
providing for the safety of the children[] were made to eliminate or prevent
the children’s removal; and (3) reasonable efforts have been made to enable the
children to return home, but there is a substantial risk of a continuing danger
if the children are returned home.

 

The
exhibit was admitted as business records.  Mother’s counsel did not object to
the exhibit, but Rule 605 states that “no objection need be made in order to
preserve the point.”  See Tex. R. Evid. 605.  The exhibit was published
to the jury while a radiologist was testifying to Sarah’s injuries.  There was
no testimony regarding the temporary orders included in the exhibit.  The
temporary orders, with the trial court’s findings redacted, had also been
admitted into evidence earlier in the trial as Exhibit 7.  These orders were
used along with the Family Service Plan to show what Mother was required to do
in order for her children to be returned to her permanently.  This exhibit was
referred to again during the State’s closing argument to show how Mother had
not complied with the required service plan.

The
orders, which contained findings based on pretrial evidence by the same judge
presiding over the termination proceeding, could be a form of judicial
influence similar to a judicial comment on the weight of the evidence.  See
M.S., 115 S.W.3d at 538 (noting that the trial judge’s factual findings in
a previous order should have been redacted “so that the jury could draw its own
conclusions”).  However, for their admission to be a reversible error, Mother
must show that the error probably caused rendition of an improper judgment.  See
Tex. R. App. P. 44.1(a)(1); M.S., 155 S.W.3d at 538 (noting that it was
the mother’s burden to show that she was prejudiced by the admitted orders).

While
Mother argues that a “reasonable inference could be drawn that the jury saw the
findings of [the trial judge],” she does not show how the admission of these
temporary orders probably caused the rendition of an improper judgment.  The
jury’s findings, as discussed below, are supported by other ample evidence in
the record.  Further, DFPS did not point out the findings to the jury for them
to consider, and it did not base any of its arguments on the findings of the
trial court.  See M.S., 115 S.W.3d at 538; In re P.D.A.,
No. 11-04-00189-CV, 2006 WL 726297, at *5 (Tex. App.—Eastland Mar. 23, 2006, no
pet.) (mem. op.) (holding that mother failed to show that the jury reached an
improper judgment based on unredacted orders containing trial court’s findings
when the jury’s findings were supported by other evidence and the State did not
base its arguments on the improperly admitted orders).  After reviewing the entire
record, we hold that Mother has not met her burden of showing she was
prejudiced by the admission of this exhibit.  See M.S., 115 S.W.3d at
538. We overrule her fifth issue.

III. 
Legal and Factual Sufficiency of the Evidence

A. 
Grounds for Termination

In
her second and third issues, Mother challenges the legal and factual
sufficiency of the evidence supporting the trial court’s findings on the
grounds for termination.  The trial court terminated Mother’s rights based on
subsections (D), (E), and (O).  See Tex. Fam. Code Ann. § 161.001(1)(D),
(E), (O) (West Supp. 2012).  In her appellate brief, Mother challenges the
legal and factual sufficiency of the evidence supporting the findings that she
knowingly placed or knowingly allowed the children to remain in endangering
conditions or surroundings, that she engaged in conduct or knowingly placed the
children with persons who engaged in conduct that endangered the physical or
emotional well-being of the children, but she did not challenge the findings
that she failed to comply with the provisions of a court order that
specifically established the actions necessary to obtain the return of her
children. The only reference to this ground for termination is in Mother’s
summary of the argument section of her brief where she states that she “did not
fail to comply” with the court order.  Mother presents no argument challenging
the trial court’s finding that she failed to comply with the provisions of a
court order that specifically established the actions necessary for her to
obtain the return of her children.  See id. §§ 161.001(O),
261.001(8) (West Supp. 2012).  She has thus waived this issue.  See Tex.
R. App. P. 38.1(i) (requiring an appellant’s brief to contain clear and concise
arguments “with appropriate citations to authorities”); see also Fredonia
State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284–85 (Tex. 1994)
(discussing the “long-standing rule” that a point may be waived due to
inadequate briefing). 

Even
if she had not waived this issue, there is sufficient evidence to support the
trial court’s finding that she failed to comply with the court order
establishing the actions necessary for the return of her children.  It is well
settled that the family code does not provide for excuses for failure to
complete court-ordered services, nor does it consider “substantial compliance”
to be the same as completion.  See In re M.C.G., 329 S.W.3d 674, 675–76
(Tex. App.—Houston [14th Dist.] 2010, pet. denied); In re T.T., 228
S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (noting
Texas courts have uniformly found substantial compliance with provisions of
court orders inadequate to avoid termination findings under subsection (O)); In
re T.N.F., 205 S.W.3d 625, 630–31 (Tex. App.—Waco 2006, pet. denied)
(emphasizing that parents must comply with every requirement of the court order
and that subsection (O) does not allow for consideration of excuses for
noncompliance) overruled on other grounds by In re A.M., 2012 WL
3242733, at *2 (Tex. App.—Waco Aug. 9, 2012, no pet. h.); Wilson v. State,
116 S.W.3d 923, 929 (Tex. App.—Dallas 2003, no pet.) (“Wilson’s economic
argument does not create a factual dispute as to her compliance:  it is,
instead, in the nature of an excuse for her failure to comply.”).  Rather, any
excuse for failing to complete a family services plan goes only to the best
interest determination.  See T.N.F., 205 S.W.3d at 631; see also
Holley v. Adams, 544 S.W.2d 367, 371 (Tex.1976); In re C.M.C., 273
S.W.3d 862, 874–75 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that
mother’s argument that she did not take a parenting class because none were
available “[did] not create a factual dispute as to her compliance; rather, it
is in the nature of an excuse for her failure to comply”).

Orders
signed by the trial court on February 11, 2011, and August 11, 2011,
incorporated the service plan that DFPS had filed with the trial court on
January 26, 2011, approved it, and made it an order of the court.  The service
plan required Mother to, among other things, complete a psychological
evaluation, establish and maintain safe, stable, and appropriate housing for a
period of at least six months, and establish and maintain suitable employment
for a period of at least six months.

Family
Based Safety Services caseworker Julissa Rodriguez testified that the
psychologist assigned to complete Mother’s psychological evaluation could not
get a hold of Mother.  When Rodriguez spoke to Mother about it, Mother lied and
said that the psychologist told her she was no longer working with DFPS.  CPS
conservatorship worker Amanda Mention testified that Mother had not established
and maintained safe, stable, and appropriate housing for a period of six
months.  At the time of trial, Mother was living in an apartment with two
roommates.  She did not know either of their last names, even though she
claimed to have known them for more than a year.  Mention testified that CPS
had concerns about her housing because it did not have enough information on
who was living in the house to perform criminal history and background checks. 
There was testimony that Mother’s brother, who has a criminal and drug use
history, may live in the apartment with her.  Mention also testified that
Mother had not refrained from criminal conduct because Mother had been using marijuana
since her DFPS case was opened.

Mother
testified that at the time of trial, she had just been hired at Denton ISD to
serve lunch, but had not begun working because she had to get fingerprinted. 
She had worked in a temporary position before that.  Prior to that, she had
worked at the Four Seasons, but had quit because she was “having issues with
another lady” who would “always mouth talk to [her].”  She also admitted that
she had not completed one of the classes that was required by the service plan.

The
evidence established that at the time of trial Mother had not maintained stable
employment or stable housing for six months and had not completed the
psychological evaluation as required by her service plan.  A reasonable
factfinder could have formed a firm belief or conviction that Mother failed to
comply with the provisions of a court order that specifically established the
actions necessary for her to obtain the return of her children.  We therefore
overrule her second and third issues as to the subsection O grounds.  Because,
along with a best interest finding, a finding of only one ground alleged under
section 161.001(1) of the family code is necessary to support a judgment of
termination, we need not address the remainder of Mother’s second and third issues. 
See Tex. R. App. P. 47.1; see also In re E.M.N., 221 S.W.3d 815,
821 (Tex. App.—Fort Worth 2007, no pet.); In re S.B., 207 S.W.3d
877, 886 (Tex. App.—Fort Worth 2006, no pet.).

B.  
Best Interest

In
her first issue, Mother challenges the legal sufficiency of the evidence that
termination was in the best interest of the children.  See Tex. Fam.
Code Ann.  §161.001(2).

There
is a strong presumption that keeping a child with a parent is in the child’s best
interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Id. § 263.307(a) (West 2011).  The
following factors should be considered in evaluating the parent’s willingness
and ability to provide the child with a safe environment:

(1)     the child’s
age and physical and mental vulnerabilities;

 

(2)     the frequency
and nature of out-of-home placements;

 

(3)     the
magnitude, frequency, and circumstances of the harm to the child;

 

(4)     whether the
child has been the victim of repeated harm after the initial report and
intervention by the department or other agency;

 

(5)     whether the
child is fearful of living in or returning to the child’s home;

 

(6)     the results
of psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child’s
home;

 

(7)     whether there
is a history of abusive or assaultive conduct by the child’s family or others
who have access to the child’s home;

 

(8)     whether there
is a history of substance abuse by the child’s family or others who have access
to the child’s home;

 

(9)     whether the
perpetrator of the harm to the child is identified;

 

(10)    the willingness
and ability of the child’s family to seek out, accept, and complete counseling
services and to cooperate with and facilitate an appropriate agency’s close
supervision;

 

(11)    the
willingness and ability of the child’s family to effect positive environmental
and personal changes within a reasonable period of time;

 

(12)    whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with:

 

(A)     minimally
adequate health and nutritional care;

 

(B)     care,
nurturance, and appropriate discipline consistent with the child’s physical and
psychological development;

 

(C)     guidance and
supervision consistent with the child’s safety;

 

(D)     a safe
physical home environment;

 

(E)     protection from
repeated exposure to violence even though the violence may not be directed at
the child; and

 

(F)     an
understanding of the child’s needs and capabilities; and

 

(13)    whether an
adequate social support system consisting of an extended family and friends is
available to the child.

 

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires
of the child;

 

(B)     the emotional
and physical needs of the child now and in the future;

 

(C)     the emotional
and physical danger to the child now and in the future;

 

(D)     the parental
abilities of the individuals seeking custody;

 

(E)     the programs
available to assist these individuals to promote the best interest of the
child;

 

(F)     the plans for
the child by these individuals or by the agency seeking custody;

 

(G)     the stability
of the home or proposed placement;

 

(H)     the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and

 

(I)      any excuse
for the acts or omissions of the parent.

 

Holley,
544 S.W.2d at 371–72.

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

C.  The
Evidence

At
the time of the trial, Adam was four years old, Megan was two years old, and
Sarah was fourteen months old.  See Tex. Fam. Code Ann. § 263.307(b)(1). 
Adam’s paternal grandmother testified that Adam was really anxious before his
visitations with his Mother, and during early spring of 2011 his anxiety was so
great that his pediatrician recommended that he be prescribed Zoloft.  Further,
she testified that Adam had told her about Tony hurting Mother in the summer of
2010, and told her that Tony choked Mother and made her cry.

Sarah
and Megan have been with the same foster family since April 1, 2011.  See id.
§ 263.307(b)(2).  Since that same time, Adam has lived with his father,
Royce.  Prior to living with his father, Adam had been living with Mother’s
mother.  Mother testified that she did not know how long Adam had been staying
fulltime with her mother, but later she testified that it had been since the
summer of 2010.  Mother did not tell Royce that Adam was not living with her,
but would have her mother bring Adam to Mother’s house on days when Royce would
pick him up for visitation.

Sarah’s
x-rays revealed that she had suffered six fractures to her body.  See id.
§ 263.307(b)(3).  Daniel Oshman, a pediatric radiologist, testified that these
types of fractures are the result of “significant trauma.”  He described a
fracture to the right femur, the left femur (which he explained as “the lining
of this bone has been stripped off as well with some sort of twisting or
grasping type injury typically that pulls the fibrous lining, the thick lining
of the bone off of the bone and causes it to bleed underneath”), the right
forearm, and the right clavicle.  Sarah’s metaphyseal fracture is of the type “almost
always seen with non-accidental trauma and often are seen with children who
were shaken.”  He said that forearm injuries like Sarah’s “usually occur[] from
a direct blow” not by grasping or twisting the baby.

Oshman
testified that the leg fractures would cause pain to the child every time she
moved.  He estimated that the fractures were about two to three weeks old at
the time they were x-rayed.  He said, “It’s . . . the fact that . . . these
injuries have obviously been there a long time and this is the first time we’re
seeing the child to get x-rays is worrisome in that . . . you know, that this
has been going on for a while.”  He believed the fractures were the result of
child abuse.

Sophia
Grant, a CARE team pediatrician at Cook Children’s Hospital also testified that
Sarah’s injuries at her young age were “extremely concerning” for child abuse. 
She believed that an adult would be aware that the child was in pain when the
fractures occurred.

There
was no evidence that the other children had been physically harmed, but Royce
testified that Mother once dropped Adam on the couch when he was a baby in
order to attack Royce in a fit of jealousy.  There was also testimony that
Mother would speak inappropriately to the children.  Royce testified that at
one visitation, Mother told Adam to get away from her because she was angry
with DFPS over something else.  See id. § 263.307(b)(4).  At another
visit, he asked her for a toy and she told him she did not bring him one
because he was sick and did not show up for the last visit.  Mother testified
that she never spanked her children, but Tony testified that that was “not
true.”  Tony said that he had once seen Mother spank Adam too hard.

Mother’s
counselor, Mark Dittloff, testified that Mother has post-traumatic stress
disorder (PTSD) as a result of her abusive childhood.  See id.
§ 263.307(b)(6).  He explained that Mother’s “ability to regulate her fear
has been compromised, either damaged or destroyed.”  Dittloff testified that
PTSD “can affect parenting in a variety of different ways.  Some parents may
simply withdraw from their children. Some may become explosive.  . . . [S]ome
may turn to drugs and alcohol. Some may continue to be very effective parents.”
 Dittloff testified that it is difficult to predict how long it will take
someone to work through their PTSD and that although Mother has improved since
seeing him, he could not testify when Mother will be well.  He believed it
would require months or even years of more therapy.

Mark
Foster, a psychologist, also evaluated Mother.  He rated her IQ as “in the low
average range” and said that her reading ability was at a fourth-grade level,
her sentence comprehension was at a sixth-grade level, and her math skills were
at an eighth-grade level.  Foster disagreed with Dittloff’s PTSD diagnosis.  He
noted no “hypervigilance” or anxiety.  He described Mother as being “reasonably
truthful” in her evaluation but noted, “There were times when she was rather
vague and evasive in answering questions, and I have some concerns there about
that.”  He noted that Mother distorted information to downplay her
shortcomings.

Foster
testified that her test results indicated that she is likely to have problems
managing her emotions, especially anger.  He explained that “it’s fairly common
for people with this particular profile to very often have some run-in with the
legal system, whether that be civil or criminal,” and that they “typically have
difficulty learning from their experience.”  He also said that Mother “viewed
herself as an exceptionally good parent,” which he said was “remarkable.”

Foster
said that Mother likely has romantic relationships that are “fairly brief and
. . . rather stormy.”  Because of those rocky relationships, her children
could “have problems with developing a sense of security.”  The children’s
ability to feel safe and protected would “certainly [be] impair[ed]”.

Mother
and Tony have a history of domestic violence.  See id. § 263.307(b)(7). 
When asked how many times Tony has assaulted her, Mother said “a lot” and “too
many.”  When asked if she recalled telling Denton County Friends of the Family
that Tony had beat her up in a car with Adam while she was pregnant with Megan,
she answered, “I think so.”  She also told Friends of the Family that Tony
pushed her while she was pregnant with Sarah and later choked her.  She claims
that Tony gave her a black eye in June or August 2010, and that he choked her
until she was unconscious on December 15, 2010.

Tony
denied ever hitting Mother when she was pregnant with Megan, but admitted that
he had “grabbed her and put her up against . . . a car.”  He also denied giving
Mother a black eye, but said that Mother did have a black eye in December 2010,
and that Mother would not tell him where it came from.  Tony admitted to using
marijuana and methamphetamine.  See id. § 263.307(b)(8).  Tony
testified that he had used marijuana with Mother one or two months after the
children had been removed, but he did not believe she used marijuana regularly.

Almost
a year after Sarah’s injuries were discovered, the perpetrator is still
unknown.  See id. § 263.307(b)(9).  Dittloff testified that Mother
believes that Tony was the perpetrator.  At trial Mother testified that Tony
could have injured Sarah but that she did not know for sure.

John
Burgess, a special investigator for DFPS testified that Tony’s grandmother told
him that she had seen Mother throw Sarah into a playpen.  Tony testified that
he does not know who hurt Sarah.  Officer Scott Salazar of the Denton Police
Department testified that Mother was the primary suspect in Sarah’s case.

Leah
McMaster, the CPS investigator who was present when Sarah was taken to the
hospital, testified that she had difficulty getting information from Mother.  See
id. § 263.307(b)(10).  When McMaster asked Mother how many children
she had, Mother first told her she only had two.  McMaster looked into Mother’s
CPS record and discovered that Mother also had Adam.  She confronted Mother.  Mother
told McMaster that she did not know who Adam’s father was, and when McMaster
told her that Royce’s name was in the CPS file, Mother claimed that Royce was
involved in Adam’s life but that she did not have any contact information for
him.  Mother also told McMaster that she did not know her mother’s contact
information.  McMaster had to again tell Mother that it was important to get in
contact with Mother’s mother, and Mother then dialed Mother’s phone number from
memory.

CASA
supervisor Kristen James noted that Mother had not really initiated services
before she was incarcerated, but Mother had told James that she wanted to work
the services to get her children back.  Officer Salazar described Mother as
evasive when he interviewed her regarding Sarah’s injuries.  Thomas Kelly, the
guardian ad litem for the children, testified that both Mother and Tony
continually denied being in a relationship with each other, which he knew was
not true.

Rodriguez
testified that it was important for Mother to complete a psychological evaluation,
but the psychologist could not reach Mother, despite repeated attempts to
schedule the evaluation.  When Rodriguez approached Mother about the
evaluation, Mother lied and said that she had talked to the psychologist, but
the psychologist told her she was no longer working with DFPS.  Rodriguez said
that a parent who is not honest with DFPS cannot be very successful in
completing her services.

Despite
being told that her relationship with Tony was inappropriate, or even harmful
to the children, Mother continued to see Tony up until the weeks before the
trial.  See id. § 263.307(b)(11).  Rodriguez testified that she never
contacted Tony because Mother told her that she was not in contact with him. 
Mother also told Rodriguez that she did not have Tony’s contact information.  When
she became pregnant with Sarah, she implied to Rodriguez that it was by another
man.  Rodriguez said that if she had known the truth about Mother’s
relationship with Tony, she would not have closed her case as successfully completed.

Mother
delayed in starting many of her services, and even when Mention rescheduled her
visitations with Adam so that Mother could attend a healthy relationships
class, Mother still did not attend the class.  However, Michelle Fox, a
counselor at Denton County Friends of the Family, testified that Mother
completed nine group sessions, even though she was only required to do four.

Rodriguez
testified that she had no concerns regarding Mother’s parenting skills. 
However, Mention testified that Mother’s parenting skills “could be adequate,”
but that she had “great concerns” after watching Mother’s visitations with the
children. See id. § 263.307(b)(12).  She described Mother’s
behavior towards Sarah during visits as “very non-loving.”  Kristen James, a CASA
supervisor, described Mother’s first visits with her children as “pretty
disturbing.”  James testified that Mother did not show any bond with Sarah,
explaining that Mother would not look Sarah in the eyes and would hand Sarah
over at the end of the visit without saying goodbye.  James recalled one visit
in the winter in which Mother left Sarah in a snowsuit buckled into her car
seat for most of the visit, despite the room being very warm, until James
suggested she take Sarah out of the snowsuit.  James also testified that
Mother’s visits improved over time and that Mother became more loving towards
Sarah.

Mention
testified that at visits, Mother would often not change Megan’s diapers, even
when Megan would tell Mother that she had gone to the bathroom.  See id.
§ 263.307(b)(12)(A).  Mention even commented on the smell to Mother, and Mother
would still not attempt to change Megan’s diaper.  Tony testified that Mother
did not like to change the babies’ diapers at home and that he often had to
change them because she did not want to do it herself.  He also said that
Mother was uncomfortable bathing the children.

Royce
also testified that when Adam was a baby, he would often have diaper rash
because he had often been sitting in a dirty diaper while in Mother’s care.  He
said that sometimes when he got Adam, he was wearing old or dirty clothes and
Royce would have to buy more clothes for him.

There
was testimony that Mother has not shown guidance and supervision consistent
with the children’s safety.  See id. § 263.307(b)(12)(C).  Mention
testified that at one visit, Adam was dangerously climbing on a high chair and
neither Mother nor her mother attempted to stop him or help him despite it
being a safety hazard.  Mention described “several different visits” in which
Adam would try to get Mother’s attention by “constantly call[ing] her name,”
and Mother would ignore him, which Mention felt was an inappropriate response. 
See id. § 263.307(b)(12)(B).

She
also described a visit in which Megan pulled a box cutter out of Mother’s
purse.  Mother told Megan not to play with it but she did not take the box
cutter away from Megan.  Megan would also take medicines out of Mother’s purse,
and if Mother took them away, she would not place them out of Megan’s reach. 
Mention testified that at another visit, Megan found Mother’s inhaler and
Mother was not watching her.  Other people had to step in to prevent Megan from
putting the inhaler in her mouth.  Sarah would also walk around with things in
her mouth and Mother would not stop her.  Mention testified that she had to
tell Mother to take the small toys out of Sarah’s mouth because they were a
choking hazard.  At other visits, Sarah would pull toys off the shelf, making a
loud crash, and Mother would not look over to make sure Sarah was not harmed.

Mention
testified that she believed it was endangering to Adam for Mother to let him
live with her mother, knowing that Mother’s mother allowed Mother’s father to
abuse her for many years and did nothing to protect her.  See id. §
263.307(b)(12)(D).  Mother said she believes her mother has good parenting
skills, and although she acknowledged that her mother physically and
emotionally abused her growing up, she wrote it off as her mother being
“frustrated” with Mother’s alcoholic father.

Mention
also expressed concern for Mother’s ability to provide a safe home environment
if she is having the panic attacks, anxiety, and paranoia from which she claims
she suffers.  Mention did not think Mother adequately screened inappropriate
people from her children.  Tony testified that he believed that Mother’s
brother lives in the apartment with Mother and her roommates, and that he saw
signs of drug use in the house “a couple of months ago.”  Royce testified that
he has concerns about the type of people Mother allows into her home.  He said,
“[I]t’s never been the greatest crowd of people,” and he described being
attacked by Mother’s brother with a knife.  Rodriguez, the Family Based Safety
Services caseworker, testified that twice she had gone to Mother’s apartment
and Mother’s brother or her mother’s roommate answered the door and Mother was
not home.

Foster
testified that he has “strong concerns” that Mother could be a protective
parent.  See id. § 263.307(b)(12)(E).  Mention expressed concern that Mother
continues to have a relationship with Tony because of their extensive history
of violence and because Tony continues to use methamphetamine.  Mother admitted
to lying to DFPS about her relationship with Tony.  Mention explained that
children can often be injured during incidences of domestic violence.  When Mother
was asked if she thought fighting in front of the children was endangering, she
answered, “I guess, yes.”

Mother
testified about one fight with Tony that occurred in front of the children in
December 2009.  She first testified that the children were not in the room, but
later explained that they had been in the room and her mother’s roommate had
removed them when she saw it was getting violent.  Mother admitted that she had
told the CPS investigator a few days later that she was not going to allow Tony
around the children anymore.  Royce’s grandmother testified that Adam would
tell her and Royce about altercations between Mother and Tony.  He would
describe “[Tony] hurting mommy and mommy crying and mommy and [Tony] fighting.
And he was very -- it was always the same scenario, and he was very specific
about [Tony] choking mommy or mommy crying.”

Mother
testified that if the children were returned, she would get a restraining order
against Tony.  Mother admitted that she had previous opportunities to get a
protective order against Tony but that she never did.  She also testified that
she moved into Tony’s house in 2010 with him and his grandparents even though
she was scared of him and his grandmother would threaten her.  But later she
admitted that she moved in because she was still in a relationship with him.  Mother
testified that she had reported to the police that Tony was stalking her, but
when asked about the reports, she could not provide any information about when
she had made the reports or how many she had made.  She was asked if she ever
told anyone at Friends of the Family that she was being stalked, and she
replied, “I think. I don’t know.”  Mention testified that CPS told Mother her continued
relationship with Tony was inappropriate because of the violence between them,
but Mother continued to see Tony.

Mother
testified that if she knew for sure that Tony had injured Sarah, she would
leave him for good.  But she could not say what it would take for her to know
for certain.  She also said that Tony had told her that he would go to jail at
the end of this case, and when she asked him if he had injured Sarah, he would
refuse to talk about it.

Mention
testified that Mother has never expressed concern over Sarah’s injuries to
her.  The guardian ad litem testified that he was concerned that neither Mother
nor Tony seemed concerned that they did not know who injured Sarah.

Foster
testified that Mother’s “expectations of what constitutes age-appropriate
behavior may be rather unrealistic.”  See id. § 263.307(b)(12)(F).  Mention
testified that Mother does not have an adequate social support system.  See
id. § 263.307(b)(13). Mother’s counselor Dittloff agreed.  Mother testified
that she could take the children to North Carolina where she has family. 
However, she did not seem to realize that meant that Adam would not be able to
see his father.  Mention testified that Mother had never told her of a plan to
move to North Carolina and that Mother had said she had not talked to those
family members “in several, several years, and it seems unrealistic to think
that that can actually occur.”

Megan
and Sarah are too young to express their desires, but Royce’s grandmother
testified that Adam did not like living with Mother’s mother because he was
afraid of her roommate.  See Holley, 544 S.W.2d at 371–72.  Royce’s
grandmother testified that Adam “never says that he misses his mom,” but that
he does talk about protecting his little sisters.  She said that Adam “talks a
lot about mommy not being there or mommy missing.”  Royce also testified that
he has never heard Adam say that he misses his mother.

Megan
and Sarah’s foster mother testified that Megan would defecate right before
visits with her mother repeatedly for two and a half months, which the foster
mother interpreted as signs of anxiety.  She said that Megan would often need
to be comforted after visitation.

Leah
McMaster, a CPS investigator who investigated Mother and Tony the night Sarah
was taken to the hospital, described Mother as being detached from Sarah,
showing no “affection or concern” for Sarah.  When Sarah’s blanket fell off at
the hospital, Mother did not move to put it back on her.  McMaster interviewed
Tony’s mother and grandmother, who both said that Mother “was rough with the
children and not very affectionate, didn’t seem to want to be there with the
children very much.”  Tony’s grandmother told McMaster that she saw Mother
throw Sarah into her crib.  McMaster testified that if Mother did have PTSD,
she would be concerned about her ability “relating to real world events” or
having an emotional attachment to her children.

Detective
Eric Beckwith, who interviewed Mother and Tony at the hospital, testified that
Mother never called Sarah by her name during the interview, but referred to her
as “it.”  Beckwith said that it was very unusual.  Officer Salazar also
testified that Mother would not refer to Sarah by her name during his interview.

Royce
testified that Mother would withhold Adam from visitation when she was angry
with Royce.  He said that he did not see Adam for almost a year because Mother
would not return his phone calls.  He eventually had to file for court-ordered
visitation.  He described Mother as manipulative and “a very smart woman.  She
knows what she’s doing.”  Mother admitted that she had been having difficulty
managing her own day-to-day life but argued that it is because of her PTSD.

Adam
is living with his father Royce and Royce’s grandparents.  Royce’s grandmother
testified that Adam is thriving in her home and described Adam as a “very smart
little boy” who loves going to pre-kindergarten.  She said that Royce is a good
father who tries very hard.  Royce testified that he would like Adam to
continue to see his sisters because Adam loves them.  DFPS plans for Adam to
continue to live with his father.

The
foster home in which the girls are placed has expressed interest in adopting
both girls.  See id.  At the time of trial, the girls had been in the
same foster home for about nine months.  The guardian ad litem testified that
he was “amazed” at how well the girls were doing in their foster home and that
they were “developing well.”  Mention testified that DFPS has no concerns about
the parenting abilities of the foster family.  The foster mother described her
experience with the girls as “[w]onderful.  Joyous.  Exciting. It’s one of my
dreams.  It’s been absolutely wonderful.”  She says the girls call her and her
husband Mom and Dad and Megan tells them she loves them “all the time.”  She
also testified that she would like for them to continue to have a relationship
with their brother.

          CASA
supervisor James testified that the foster home that the girls are in is a
“great placement.”  She also testified that she could not visit Mother’s home
because Mother could not give her “an address of where she was living exactly.”

Royce
is currently living with his grandparents while he attends college, but he is
planning on moving into his own place with Adam when he graduates with a degree
in mechanical engineering.  The guardian ad litem testified that he thought
Royce was “quite acceptable” in his ability to care for Adam and his choice in the
daycare in which he had enrolled Adam.

The
guardian ad litem recommended that Mother’s rights be terminated for a number
of reasons.  He testified,

Well, first of all,
the big concern is we don’t know who hurt that baby. It’s possible anybody did
it. But to me and to CASA, that's an unsafe environment to be putting that baby
back in because you don’t know if someone—if the baby could be hurt again.

 

We’re also concerned
about the support for the children. How are they going to be supported?

 

We're also concerned
about the support structure for the parents. Where are they going to go for
help? Who is going to do the daycare? Are they both—are—whoever gets them, are
they going to get a job and keep that job for more than a few weeks and quit?

 

So those—those are
the big issues. There’s a bunch of them. Safety is—is a key issue obviously,
the ability to support and maintain a proper environment, safe environment for
the child.

 

Royce
testified that he believed Mother’s parental rights should be terminated
because he does not believe that the children are safe in her care.

Considering
the relevant statutory factors in evaluating Mother’s history of domestic
violence, the magnitude of Sarah’s injuries and the lack of resolution in
finding the perpetrator, Mother’s dishonesty with police and DFPS agents, her
inability to effect positive environmental and personal changes, her inability
to provide a safe home and protect the children from exposure to violence, and
the other relevant statutory and Holley factors, we hold that, in light
of the entire record, and giving due consideration to evidence that the jury could
have reasonably found to be clear and convincing, the jury could reasonably
have formed a firm belief or conviction that termination of
Mother’s parental rights to the children was in the children’s best
interests.  Accordingly, the evidence is legally and
factually sufficient to support the jury’s family code section 161.001(2) best interest finding.  We overrule Mother’s
first issue.

Conclusion

Having
overruled Mother’s issues on appeal, we affirm the judgment of the trial court.

 

LEE GABRIEL

JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

 

DELIVERED:  September 27,
2012

 



 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-11-00520-CV

 

 


 
 
 In
 the Interest of A.T.K., M.A.C., and S.A.C., the Children
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From the 211th District
 Court
  
 of
 Denton County (2010-31268-211)
  
 September
 27, 2012
  
 Opinion
 by Justice Gabriel
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Justice Lee Gabriel

 

 









[1]See Tex. R. App. P. 47.4.





[2] We use aliases for all of the children throughout this
opinion.  See Tex. R. App. P. 9.8(b)(2).





[3]In her later-filed Motion
for Appointment of Counsel, Mother claims that she completed an application for
appointed counsel and financial affidavit prior to the January 6, 2011
adversary hearing.  There is nothing on record to support her claim, nor did
she alert the trial court to any application at the hearing.





[4]Mother did file a motion
to retain the suit on the court’s docket and set a new dismissal date, which
was denied.  However, Mother only moved on the ground that a parent-child
bonding assessment had not been done, not on the ground that she had not had
time to complete her services.